## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

Cory Soderberg, Adam Klym,
Joe Jadoonath, Nathan Ostlund, and
Ryan Rud, on behalf of themselves and
all other individuals similarly situated,

                      Plaintiffs,

v.

Naturescape, Inc.,

                      Defendant.

Court File No.: 10-cv-03429 (PAM/JJG)

**DEFENDANT'S MEMORANDUM OF
LAW IN SUPPORT OF ITS
MOTION TO DECERTIFY
THE FLSA COLLECTIVE ACTION**

## I.      INTRODUCTION

The Defendant, Naturescape, Inc. ("Naturescape"), respectfully submits this Memorandum of Law in Support of its Motion to Decertify the FLSA Collective Action ("Motion"). The named plaintiffs and opt-in plaintiffs (collectively, "Plaintiffs") allege Naturescape violated the overtime provisions of the Fair Labor Standards Act ("FLSA") by paying overtime using the fluctuating workweek method ("FWM") as set forth in 29 C.F.R. § 778.114 (2011). Under the FWM, employees are paid a set salary plus one-half their regular rate for all overtime hours worked.

Plaintiffs are comprised of current and former branch managers, lawn specialists, mowers and tree & shrub specialists. However, in order to proceed collectively, Plaintiffs must prove they are similarly situated. Plaintiffs are unable to do so. Plaintiffs

1

were not harmed by a common, unlawful policy.  Rather, Naturescape's policy was to voluntarily pay its branch managers overtime and to pay its lawn specialists overtime using the FWM.  The policies are neither common nor unlawful.

Even if they were, the different factual and employment settings among the Plaintiffs would make for a complicated and tedious trial.  The Plaintiffs come from twenty different locations, five different states, four different job positions and all with different job duties based on their position and location.  Some worked over 600 hours of overtime, some worked under 10.  Some received bonuses, some did not.  The only commonality about their factual and employment setting is that they were all paid a set salary plus overtime at ½ their regular rate of pay (based on a 40 hour week instead of actual hours worked).  Accordingly, the collective action should be decertified.

## II.  STATEMENT OF FACTS

### A.  PROCEDURAL HISTORY

1.      On August 12, 2010, Cory Soderberg ("Soderberg") filed the instant action alleging him, Adam Klym ("Klym"), Joe Jadoonath ("Jadoonath"), Nathan Ostlund ("Ostlund"), Ryan Rud ("Rud") and others "similarly situated", were denied overtime wages.  [Doc No. 1].

2.      On November 10, 2010, Soderberg, Klym, Jadoonath and Ostlund filed a Plaintiff's Consent to join the collection action. [Doc Nos. 10, 10-1, 10-2].  Rud did not file a Plaintiff's Consent.

3.      On June 20, 2011, the Court conditionally certified the collective action for all branch managers and lawn specialists employed by Naturescape who worked overtime from July 15, 2008 to June 20, 2011.  [Doc No. 29].

4.      On July 5, 2011, the Court facilitated judicial notice of the conditional certification of the collective action.  [Doc No. 32].

5.      Plaintiffs filed 83 Plaintiff's Consent forms between July 11, 2011 and August 15, 2011.  [Doc Nos. 10, 33, 37, 39-43, 47, 54-55, 60, 62, 64].

6.      Brendon Stefanski, Jeff Verenski, and Anthony Corsten filed a Plaintiff's Consent even though they were Mowers.  (August 18, 2011 Affidavit of Todd Furry ("Furry Aff.") ¶ 2).  Jay Pitel and Mark Rommelfaenger filed a Plaintiff's Consent even though they were Tree & Shrub Specialists. (*Id*. ¶ 3).  These individuals were not on the opt-in list provided to Plaintiffs as they were neither a branch manager nor lawn specialist.  (*Id*. ¶ 4).

**B.      NATURESCAPE'S BUSINESS & POSITIONS**

  **a.      Naturescape's Background.**

7.      Todd Furry and his wife have owned Naturescape since its inception 26 years ago, and have employed thousands of employees. (July 28, 2011 Deposition of Todd Furry attached to August 18, 2011 Affidavit of Corie J. Tarara ("Tarara Aff.") ¶ 2, Ex. A ("Furry Dep.") at 4:13–23, 64:9–10).

8.      Naturescape's principal place of business is located in Muskego, Wisconsin.  [Doc No. 24, ¶ 2].

9.  Naturescape employs approximately 190 employees; about 100 are lawn specialists and 24 are branch managers (one for each branch).  (Furry Dep. 5:7–22).

10.  Naturescape currently performs lawn care services in six states (Minnesota, Wisconsin, Illinois, Kentucky, Iowa and Indiana) and 24 branch locations (eight branches in Wisconsin, eight branches in Illinois, three branches in Indiana, two branches in Minnesota, two branches in Iowa, and one branch in Kentucky).  (Doc No. 24, ¶ 3; Furry Dep. 5:4–5).

11.  Naturescape's largest branch, located in Muskego, WI, has twelve lawn specialists as well as service coordinators and other employees reporting to the branch manager for a total of 20-25 employees. (Furry Aff. ¶ 5).  Naturescape's smallest branches (brand new) are located in Lafayette, Indiana and Cedar Rapids, Iowa and are each made up of just the branch manager and an administrative assistant. (*Id*. ¶ 6).  The average branch employs one branch manager and four to five lawn specialists.  (*Id*.)

12.  Branch managers report to a regional manager; a regional manager may only visit each branch once per month or less.  (Soderberg Dep. 22:16, Ex. 2 at DEF 584; Furry Dep. 104:17–2, 107:18–23; July 28, 2011 Deposition of Scott Oman attached to Tarara Aff. ¶ 4, Ex. C  ("Oman Dep.") 49:5–7).

13.  Lawn specialists are able to set their own hours as there is no required start or end time; they just have to work to meet their weekly goal, regardless if that takes 45 or 35 hours.  (Furry Dep. 35:16–22; May 11, 2011 Deposition of Adam Klym attached to Tarara Aff. ¶ 5, Ex. D ("Klym Dep.") 19:4–8).  In fact, the majority of employees do not

record a time deduction for meals, as they prefer to eat while they are traveling from one customer to another, and thus, are paid for that time.  (Furry Aff. ¶ 27).

14.     Different branches provide different services.  Some branches don't mow, prune or offer grub control.  (Furry Dep. 82:25, 83:1–6).

15.     Lawn specialists who work at branches in the South start production earlier than branches in Minnesota and Wisconsin. (Furry Dep. 129:17–22).

16.     Branch goals are not the same.  Each branch has different goals based on the branch size and the territory size of the branch and the distance between its customers.  (Furry Dep. 74:14–17).

**b. <u>Previous Wage & Hour Complaints.</u>**

17.     Naturescape's compensation policy has been reviewed by the State of Wisconsin Department of Workforce Development ("WDWD") nine times and held valid each time.  (Doc No. 24, ¶ 8, Ex. A, Furry Aff. ¶ 6, Furry Dep. 61:9–12).  WDWD is aware of Naturescape's use of the FWM for overtime payments, as well as its bonus structure, and has never told Naturescape it was paying overtime incorrectly.  (Furry Dep. 61:3–13).

18.     Naturescape has had three complaints regarding its pay under Illinois state law with the Illinois Department of Labor ("IL DOL") in the past 22 years; the IL DOL has found it to be valid and compliant until recently.  (Furry Dep. 61:21–24; Furry Aff. ¶ 7).  Not until recently has the IL DOL determined that Naturescape could not base the overtime rate on 40 hours per week (instead of actual hours worked); but this was a

reversal of the same auditor's initial position, and it is currently being appealed. (Furry Dep. 63:1–9).

19. In the past 26 years, only three Minnesota employees have brought conciliation court claims regarding alleged wages due; two sought payment of their discretionary winter pay and the third was Soderberg's case. (Furry Dep. 62:11–15).

## C. NATURESCAPE'S COMPENSATION POLICY.

20. From 2008 through May 31, 2011, Plaintiffs were paid pursuant to the "Salaried" guidelines in Naturescape's Pay Schedule and were paid overtime at a rate of ½ their hourly rate based on a 40 hour workweek (not actual hours worked). (Tarara Aff. ¶ 9, Ex. H at No. 1; Furry Dep. 67:14-15, 70:3–19, Ex. 7 at DEF 1185).

21. Except for the first and last weeks of employment, Plaintiffs were paid a set bi-weekly salary for all weeks in which they performed any work, even if they did not work 40 hours. (Furry Dep. 85:24–86:2; 113:18–21; Oman Dep. 129:22–24).

22. Plaintiffs have no facts to support that they did not receive half their regular rate for all overtime hours worked, or that any such failure was willful. (Soderberg Dep. 66:24, Ex. 4 at DEF 945, Oman Dep. 94:13-14, Ex. 15 at DEF 1164, Klym Dep. 54:7, Ex. 4 at DEF 869, Jadoonath Dep. 28:24-25, Ex. 6 at DEF 983, Ostlund Dep. 35:19-20, Ex. 6 at DEF 798, 830, Rud Dep. 31:8, Ex. 8 at DEF 874).

23. Naturescape requires branch managers and lawn specialists to track hours worked. (Tarara Aff. ¶ 9, Ex. H, at No. 9; May 13, 2011 Deposition of Ryan Rud ("Rud Dep.") 39:4–5; May 13, 2011 Deposition of Joe Jadoonath attached to Tarara Aff. ¶ 6,

Ex. E ("Jadoonath Dep.") 35:22–24; Furry Dep. 67:14-15, 68:1-15, Ex. 7 at DEF 1184; Oman Dep. 58:11–13).

24.     As of May 31, 2011, lawn specialists are paid an hourly rate and overtime at a rate of time and one-half for all hours over forty per week.  (Furry Dep. 108:21-109:12).

**a. Naturescape Pays All Employees Overtime.**

25.     Naturescape pays salaried employees overtime based on the FWM and using a 40 hour divisor (instead of actual hours worked):

> Additionally, Naturescape states it pays its Branch Managers and Lawn Specialists an annualized salary paid in bi-weekly installments (26 pay periods in a year).  If they work more than 40 hours per work week, they also receive extra compensation.  Since they do not have an hourly rate of pay, their annualized salary is translated into an equivalent weekly salary by dividing it by 52.  Since the salary covers all hours worked in a work week, the weekly salary is translated into an hourly rate and one half of their regular rate is paid for extra compensation for hours worked over 40 in a work week.  For example: if an employee is paid an annualized salary of $26,000, the weekly salary is computed as: $26,000/52 = $500/wk.  The employee's regular rate is calculated as the weekly salary divided by 40 hours ($500/40 = $12.50/hr.).  Because the employee has already been paid a salary for all hours, the extra half time is paid as extra compensation for hours worked over 40.  Thus, the $12.50 regular rate is divided by two ($12.50 / 2 = $6.25).  The employee receives the additional $6.25/hour for the hours worked over 40.  In addition, Naturescape allocates an equal amount of the extra compensation pay as a bonus for the winter off-months when work is slow, so employees can maintain a steady stream of income without the need for unemployment.  However, employees must be employed at the time the bonus is paid out to receive it.  Thus, terminated employees are not eligible to receive the bonus which is intended to maintain Naturescape's current employees during the winter non-working months.

(Tarara Aff. ¶ 9, Ex. H at No. 4).

26.     Naturescape first recognized that branch managers are exempt employees 22 years ago after reviewing the DOL and State of Wisconsin literature.  (Furry Dep. 30:10–16).  Naturescape reviews this information and consults with its attorney at least once per year to make sure they are compliant with wage and hour laws.  (Furry Dep. 31:18–33:5).

27.     Naturescape chooses to pay overtime to every non-owner employee, up to and including its Vice President.  (Furry Dep. 107:10–12).

28.     Plaintiffs admit they were paid a fixed salary for all weeks they performed work, and received one-half their regular hourly rate for all overtime work ("a base salary plus overtime").  (Soderberg Dep. 64:1-3, 16–20; Klym Dep. 41:6–25; Rud Dep. 21:3–8; Jadoonath Dep. 32:5-20; May 13, 2011 Deposition of Nathan Ostlund attached to Tarara Aff. ¶ 7, Ex. F ("Ostlund Dep.") 31:13-18).

29.     For each overtime hour an employee works, an equal amount may be paid to them by Naturescape as "Winter Pay" -- paid time off during the winter months when there is no work.  In order to receive Winter Pay, an employee must work overtime and still be employed by Naturescape at the end of the year.  Naturescape also reserves the right to not pay out Winter Pay.  (Furry Dep. 66:4–67:5; Soderberg Dep. 67:18, Ex. 5 at DEF 478).

b. **Naturescape Also Provides Generous Bonuses**.

30.     Naturescape provides production bonuses as well as discretionary Christmas, year-end and picnic bonuses.  (Furry Dep. 37:21–24, 48:10–13, 67:14, Ex. 7 at DEF 1185).

31.     Naturescape employees work until their goals are met; they can work as many extra hours they want in order to be paid more and earn a higher bonus.  (Klym Dep. 55:5–11).

32.     The year-end bonus is based on branch sales and all branch employees, even the administrative assistant, receives a part of the bonus regardless of the work they have done.  (Furry Dep. 37:3–12, 75:17–24; Furry Aff ¶ 9, Ex. K).

33.     Branch managers receive a greater percentage of the year-end bonus allocated to the branch.  (Furry Aff. ¶ 8). They also are eligible for additional bonuses that lawn specialists are not eligible for.  (Oman Dep. 91:13–15, 89:7-8, Ex. 12).

34.     Lawn specialists can earn production bonuses for five, six-week periods, which are based on the number of lawn applications (not hours worked).  (Furry Dep. 18:13–18, 19:2–4, 85:22–25).

35.     Branch managers are not eligible for production bonuses.  (Furry Dep. 18:19–23, 82:3–9).  It is impossible for a branch manager to earn a production bonus as they have too many managerial, administrative and sales duties to consume their time. (Furry Dep. 18:25–19:1, 78:25-79:9, Ex. 8 at DEF 1014, 1035, 79:16–22).

9

36.　　Branch managers are eligible to receive a year-end bonus based on the sales performance of their branch; it has nothing to do with production of lawn applications. (Furry Dep. 19:5–20).

37.　　Plaintiffs claim they were forced to deduct time on their timesheets for lunches and breaks, which impacted their bonus.  (Klym Dep. 46:18–47:7).

38.　　Rud testified that it was likely Soderberg, his Branch Manager, who told him to deduct time on their timesheets for lunches and breaks.  (Rud Dep. 39:15–22).

**c.**　**Naturescape Provides Vacation Time.**

39.　　First year Naturescape employees receive two weeks paid vacation. After their first year they receive three weeks paid vacation.  (Furry Dep. 67:14-15, Ex. 7 at DEF1185).

40.　　Vacation is typically authorized in the winter months. (Soderberg Dep. 64–65; Furry Dep. 67: 14-15, Ex. 7 at DEF1185).

**d.**　**Naturescape Also Provides Winter Paid Time Off.**

41.　　Naturescape provides paid time off in the winter based on the amount of overtime hours they work in the season ("Winter Pay").  (Furry Dep. 67:14-15, Ex. 7 at DEF1185).

42.　　Winter pay is designed to give Naturescape employees income during the winter months when they are not working.  (Furry Dep. 62:17–22).

43.　　Winter pay is based on one-half their hourly rate for each hour of overtime. (Furry Dep. 66:12–17).

44.     The payment of Winter Pay is contingent upon being employed and working overtime, and any other discretion of Naturescape.  (Furry Dep. 66:18–67:6, 14-15, Ex. 7 at DEF1185).

**D.     BRANCH MANAGERS' JOB DUTIES**

**a.   <u>Management, Administrative & Sales Responsibilities</u>.**

45.     Branch managers are responsible for the success of their branch. (Furry Dep. 101:3–9).  They have more responsibilities and different responsibilities, than the lawn specialists that work for them. (Soderberg Dep. 22:16, Ex. 2 at DEF594-601, 56:3–9; Oman Dep. 88:20–23).   Accordingly, branch managers are paid more than lawn specialists. (Soderberg Dep. 54:14–22; Oman Dep. 64:21–25).

46.     Branch managers are responsible for implementing Naturescape's compensation policies at their branch. (Tarara Aff. ¶ 9, Ex. H, at No. 11; Soderberg Dep. 59:6–13; Rud Dep. 20:10–20).

47.     Unlike lawn specialists, branch managers interview, hire, fire, and discipline employees.  (Doc No. 24, ¶ 7; Soderberg Dep. 22:16, Ex. 2 at DEF 585, DEF 594-601; Klym Dep. 31:3–5; Furry Dep. 103:2–4; Oman Dep. 15:10–13, 34:12–16).  Branch managers train new employees, explain the compensation system and answer questions regarding pay.  (Furry Dep. 104:24, 105:8–13, 47:6–11, 52:2–3; Rud Dep. 49:14–17; Oman Dep. 39:23; Soderberg Dep. 36:8–9).  Branch managers also conduct performance reviews and audits of the lawn specialists.  (Furry Aff. ¶ 9).

48.     Branch managers are responsible for following the Naturescape Company Handbook, but implement the policies at their branch by their discretion. (Furry Aff. ¶ 10; Furry Dep. 67:14-15, Ex. 7 at DEF1172-1209).  For example, branch managers hold weekly morning meetings per company policy, but branch managers can decide when to hold the meetings.  (Oman Dep. 55:15–25, 147:9–15; Furry Dep. 67:14-15, Ex. 7 at DEF1186).

49.     The extent to which a branch manager performs lawn care depends on the size of the branch (both lawns treated and number lawn specialists they are supervising); whether the branch is behind in work, as well as employee turnover.  The larger the branch the less hands-on work. (Furry Aff. ¶ 11; Soderberg Dep. 21:31; Ostlund Dep. 27:21–24; Oman Dep. 50:1–6).  Branch Managers assign routes for their lawn specialists. (Klym Dep. 24:12-14).

50.     New branches require the branch manager to be more hands-on until the sales volume increases and more lawn specialists can be hired to perform those duties. (Furry Aff. ¶ 12).  The branch manager at the largest branch may work on three to five lawns per week, versus the lawn specialists at that location who may work on 150 lawns per week.  (*Id.* ¶ 13; Oman Dep. 80:1-11).  Most of the lawn care a branch manager performs is estimates, customer lawn inspections, and service calls following a customer complaint.  (Furry Dep. 54:10-15).

51.     Branch managers approve the branch employees' time sheets.  (Soderberg Dep. 20:24–25, 22:16, Ex. 2 at DEF 594; Furry Dep. 68:19–25; Oman Dep. 58:17–18).

52.     Branch managers are responsible for maintaining inventory. (Soderberg Dep. 21:1–3, 44:22–25, 22:16, Ex. 2 at DEF 594; Jadoonath Dep. 43:23–25; Oman Dep. 57:8–16).

53.     Branch managers review production reports from the prior day and track the number of lawn applications for the lawn specialist and branch to ensure they are meeting production goals.  (Soderberg Dep. 22:16, Ex. 2 at DEF594, 47:2–7).

54.     Branch managers check training reports every morning to make sure they are filled out completely and accurately.  (Soderberg Dep. 22:16, Ex. 2 at DEF 594-601).

55.     Branch managers manage the personnel file for each employee.  (Soderberg Dep. 44:5–11; Rud Dep. 47:9–10; Jadoonath Dep. 41:15–17; Ostlund Dep. 24:19-22; Oman Dep. 71:15–17).

56.     Branch managers are responsible for auditing the lawn specialists' work and vehicle upkeep. (Soderberg Dep. 21:4–11, 22:16, Ex. 2 at DEF594-601, 38–39:19–2, 51:13–19; Rud Dep. 47:4–16; Jadoonath Dep. 41:18–20; Ostlund Dep. 24:23–25; Oman Dep. 37:19–21, 49:17–19).

57.     Branch managers are responsible for the upkeep of the branch.  (Soderberg Dep. 53:15–22, 22:16, Ex. 2 at DEF594-601).

58.     Branch managers instruct lawn specialists when to make sales calls. (Jadoonath Dep. 43:1–5; Soderberg Dep. 22:16, Ex. 2 at DEF594-601).

59.     Branch managers order office supplies such as pens, pencils, etc. (Oman Dep. 146:19-21; Soderberg Dep. 22:16, Ex. 2 at DEF594-601).

60.     Branch managers approve or deny lawn specialists' vacation time.  (Oman Dep. 66:12–15; Soderberg Dep. 22:16, Ex. 2 at DEF594-601).

**b.  Branch Managers—Specific Examples of Plaintiffs' Duties.**

61.     Soderberg and Oman made at least $455 per week each week they performed work at Naturescape.    (Soderberg Dep. 66:24, Ex. 4 at DEF761-762, 945; Oman Dep. 94:13-14, Ex. 15 at DEF1145, 1164).

62.     Soderberg was a branch manager at the Eden Prairie branch and the South Saint Paul Branch.  (Soderberg Dep. 15:16–25).  Soderberg's bi-weekly salary increased by approximately $400 when he became a branch manager.  (Soderberg Dep. 54:14–22).

63.     Rud, Jadnoonath and Ostlund reported to Soderberg (who was responsible for approving and signing off on their timesheets and explaining the compensation policy) during the course of their employment.  (Soderberg Dep. 15:15–25, 58:11–25; Jadoonath Dep. 16:18–22; Rud Dep. 20:10–20; Ostlund Dep. 14:1–7).

64.     Soderberg hired and explained the Naturescape compensation policy to Jadoonath and Rud.  (Jadoonath Dep. 22:24–23:8; Rud Dep. 20:10–20).

65.     Soderberg never mowed lawns, trimmed shrubs or installed landscape materials.  (Soderberg Dep. 20:2–16).

66.     Soderberg supervised two or more employees.  (Soderberg Dep. 35:14–25).

67.     Soderberg did production for about 2 hours per day (less than 20% of the workday).  (Soderberg Dep. 19-25).

14

68.     Scott Oman was the branch manager at the Eagan branch and the South Saint Paul branch. (Soderberg Dep. 15:3-4; Klym Dep. 16:3–4; Oman Dep. 12:2–13). When Oman demoted himself from branch manager to lawn specialist to move back to Wisconsin his salary decreased.  (Oman Dep. 12:22-13:3, 64:15–18).

69.     As a branch manager, Oman helped set up the new Eagan branch by going shopping for furniture, ordering office supplies, ordering equipment, meeting with the telephone people, interviewing and hiring new employees, talking to the Department of Agriculture to get licensed and setting up advertising with Yellow Pages. (Oman Dep. 15:5–9, 133:12–25, 136:2–14).

70.     As a branch manager setting up a new branch, Oman performed sales functions such as passing out brochures to people and getting them to sign up for the business.  (Oman Dep. 135:12–16, 136:11–19).

71.     As a branch manager, Oman would go out and buy small parts for the equipment and pesticides from distributors as needed.  (Oman Dep. 57:21–58:5).

72.     When Oman was a branch manager at the Eagan branch, at least five or six lawn specialists worked for him. (Oman Dep. 16:17–22).

73.     Oman hired and explained the compensation policy to Ostlund, Soderberg and Klym.  (Ostlund Dep. 17, 28-29; Soderberg Dep. 14, 57–58; Klym Dep. 14; Oman Dep. 69:8-10; 70:2–10).

74.     As a branch manager, Oman assigned territories and regions to the lawn specialists to perform work. (Oman Dep. 38:22–25).

75.     Oman spent about 2 hours per day (less than 20% of the workday) doing production.   (Oman Dep. 8892).

**E.     LAWN SPECIALISTS.**

76.     Lawn specialists typically perform lawn aerations; tree, lawn, and shrub fertilizations; and weed control.  (Soderberg Dep. 19:19–21, Ex. 2 at DEF 585-593; Klym Dep. 19:20–21; Rud Dep. 14:22–25).

77.     Lawn specialists do not have other employees reporting to them and do not have the ability to hire or fire anyone. (Klym Dep. 23:22–24:4).

78.     Lawn Specialists are required to meet weekly goals given by their branch manager.  (Furry Dep. 67:14, Ex. 7 at DEF1209).

79.     Lawn specialists are required to follow all requests given by the branch manager.  (Furry Dep. 67:14, Ex. 7 at DEF1209).

**a.   Lawn Specialists—Specific Examples Of Plaintiffs' Duties.**

80.     Klym was a lawn specialist at the Eagan and South Saint Paul branches. (Klym Dep. 15:22–24, 17:10–13).

81.     Rud was a lawn specialist at the Eden Prairie branch. (Rud Dep. 12:24, 14:7).

82.     Jadoonath was a lawn specialist at the Eden Prairie and South Saint Paul branches. (Jadoonath Dep. 15:19–21, 16:17–18).

83.     Ostlund was a lawn specialist at the Eagan, South Saint Paul and Eden Prairie branches.  (Ostlund Dep. 14:4–14).

16

**F.     DEPARTMENT OF LABOR INVESTIGATION AND FINDINGS.**

84.     The U.S. Department of Labor ("DOL") audited Naturescape in late 2010, early 2011 and determined that Naturescape should have paid overtime on the nondiscretionary bonuses given to its employees.  (Furry Dep. 46:3–47:2).

85.     In its finding, the DOL determined the maximum amount due to the majority of the opt-in plaintiffs.  (Furry Aff. ¶ 15, Ex. B).

86.     The DOL did not give Naturescape credit for overpayments made to each overtime hour.  (Furry Aff. ¶ 15, Ex. B).

87.     Naturescape voluntarily paid 2008 backwages under the same method authorized by the DOL settlement.  (Furry Aff. ¶ 15, Ex. B).

88.     The following Plaintiffs have cashed the checks issued by Naturescape in settlement with the DOL for back wages due: Jamie Moesch, Justin Shea, Larry Gill, Robert Kohloff, Austin Weisnicht, Matt Redig, Carl David Miller, and Mark Rommelfaenger. (Furry Aff. ¶ 14, Ex. A).

**G.     INDIVIDUAL PLAINTIFF COMPENSATION ISSUES.**

   **a.   Opt-In Plaintiffs.**

89.     The median overtime hours paid to the opt-in plaintiffs since July 15, 2009 is approximately 66.5 hours.  (Furry Aff. ¶ 16).

90.     Five opt-in plaintiffs did not work overtime after July, 15, 2008. (Furry Aff. ¶ 17, Ex. D).

91.     Twenty-two opt-in plaintiffs did not work overtime after July 15, 2009. (Furry Aff. ¶ 18).

92.     Forty-five of the opt-in plaintiffs did not receive a bonus. (Furry Aff. ¶ 19).

93.     Jay Pitel was a tree and shrub specialist who worked a total of 23.5 hours of overtime during his employment in 2008.  [Doc No. 57, ¶ 2].

94.     Jose Felix was paid for over 735 overtime hours since July 15, 2008, while Brett Bilzing Ernst was paid for 0.25 overtime hours during that same period.  (Furry Aff. ¶ 20).  Felix had numerous warnings for not meeting production goals.  (Furry Aff. ¶ 21, Ex. D).  Matt Redig purportedly worked over 580 hours between July 15, 2008 and August 2011.  (Furry Aff. ¶ 22).  Redig had three warnings for not meeting production goals.  (Furry Aff. ¶ 23, Ex. E).

95.     Oman did not complain about his pay at Naturescape was satisfied with the pay he received.  (Oman Dep. 72:14–19).  Oman has never filed a complaint with the DOL regarding wages at Naturescape.  (Oman Dep. 73:23–74:1).

**b. Soderberg.**

96.     Soderberg worked for Naturescape from April 2006 through August 2009. (Soderberg Dep. 14:6–9).

97.     Soderberg worked under 40 hours a week and his pay was not docked.  For example,  Soderberg worked 23.5 hours one week and 27.5 hours the next week and for the corresponding payroll ending February 9, 2008, he received his full salary of $1,180.

(Soderberg Dep. 66:8-9, Ex. 3 at DEF 717, Soderberg Dep. 66:24, Ex. 4 at DEF 817, 70:3–12).

98.     Soderberg worked 51.5 overtime hours the payroll week ending April 4, 2009.  This is based on a two week payroll.  Soderberg earned $2,062.13 for working a total of 131.5 hours, which averages out to $15.68 per hour. (Soderberg Dep. 66:24, Ex. 4 at DEF 945, Furry Aff. ¶ 24).  In April 2009, the Federal Minimum Wage was $6.55 per hour. (Tarara Aff. ¶ 10, Ex. I).

99.     At the time he quit, Soderberg was paid $10.12 hourly for overtime hours. (Soderberg Dep. 66:24, Ex. 4 at DEF 945).

**c.  Klym.**

100.     Klym worked for Naturescape from May 2006 to August 2008.   (Klym Dep. 54:7, Ex. 4 at DEF 869).

101.     Klym worked 39 overtime hours during the payroll ending October 16, 2007.  Klym's average hourly earnings for this period were $12.55 per hour.  (Klym Dep. 54:7, Ex. 4 at DEF 869). The Federal Minimum Wage in October 2007 was $5.85. (Tarara Aff. ¶ 11,  Ex. J).

102.     At the time he quit, Klym was paid $7.75 per hour for his overtime hours. (Klym Dep. 54:7, Ex. 4 at DEF 869).

**d.  Jadoonath.**

103.     Jadoonath worked for Naturescape from March 2008 to March 2010. (Jadoonath Dep. 16:9–16).

104. Jadoonath received his full salary and 12.5 hours of overtime pay when he worked 8 hours one week and 52.5 hours the next week. (Jadoonath Dep. 37:21–38:2, 27:18-19, Ex. 4 at DEF 45, Ex. 5 at DEF 668, Ex. 6 at DEF 855).

105. Jadoonath worked 55 overtime hours for the payroll ending May 17, 2008. He was paid $1,558.75 for the 135 hours he worked, which averages to $11.55 per hour. (Jadoonath Dep. 28:24-25, Ex. 6 at DEF 983). The Federal Minimum Wage in May 2008 was $5.85 per hour. (Tarara Aff. ¶ 12, Ex. K).

106. At the time he quit, Jadoonath was being paid $7.38 for each overtime hour. (Jadoonath Dep. 28:24-25, Ex. 6 at DEF 983).

**e. Rud.**

107. Rud worked for Naturescape from March 2008 through September 2008. (Rud Dep. 11:17–12:5).

108. Rud's salary was $1,602 every two weeks regardless if he worked 40 hours per week or not. (Rud Dep. 32:9–4, 31:8, Ex. 8 at DEF 874).

109. Rud worked 46 hours one week and 0 hours the next week for the payroll ending August 23, 2008 and he still received his bi-weekly salary of $1,160 plus 6 hours of overtime at $47.13 for a total of $1,207.13. (Rud Dep. 31:1-2, Ex. 7 at DEF683, 33:12-13, Ex. 8 at DEF871).

110. Rud worked 33.5 overtime hours during the pay period ending May 3, 2008. He was paid $1,402.88 which is average hourly earnings of $12.36 per hour. (Rud

Dep. 31:8, Ex. 8 at DEF 874).  In May 2008, the Federal Minimum wage was $5.85 per hour.  (Tarara Aff. ¶ 12, Ex. K).

111.   At the time he quit, Rud was being paid $7.25 for each overtime hour. (Rud Dep. 31:8, Ex. 8 at DEF 874).

**f. Ostlund.**

112.   Ostlund worked for Naturescape from March 2005 through March 29, 2008.  (Ostlund Dep. 15:4-12).

113.   Ostlund would receive his full salary even for weeks he worked only 28.5 and 25 hours.  (Ostlund Dep. 36:18-38:2–5, Ostlund Dep. 38:1, Ex. 5 at DEF 618, Ex. 6 DEF 678)

114.   Ostlund worked 35.5 overtime hours for the payroll ending September 22, 2007.  He was paid $1,515.13 for an average hourly wage of $13.12 per hour.  (Ostlund Dep. 35:19-20, Ex. 6 at DEF 798, 830). The Federal Minimum Wage in September 2008 was $6.55 per hour.  (Tarara Aff. ¶ 12, Ex. K).

115.   At the time he quit, Ostlund was being paid $9.75 for each overtime hour. (Ostlund Dep. 35:19-20, Ex. 6 at DEF 798, 830).

## III.   LEGAL ANALYSIS

### A.   THE DECERTIFICATION STANDARD.

The FLSA allows a collective action to be maintained against an employer if the plaintiffs are all "similarly situated".  29 U.S.C. § 216(b) (2008); *Smith v. Heartland Auto. Serv., Inc.*, 404 F.Supp.2d 1144, 1149–50 (D. Minn. 2005).  Since the FLSA does

not define "similarly situated," courts generally apply a two-step approach to determine whether a collective action should proceed. *Smith,* 404 F.Supp.2d at 1149.

## 1. **The Two-Step Process.**

With respect to the first step of the process, this Court granted Plaintiffs' conditional certification. [Doc No. 29]. Once a class has been conditionally certified, the second step provides that the defendant may move the court to decertify the class. *Smith,* 404 F.Supp.2d at 1149 – 50. At the second step, the courts use a stricter standard to make a factual determination as to whether the members of the conditional class are in fact similarly situated. *Koren v. Supervalu, Inc.,* No. 00-CV-1479 (ADM/AJB), 2003 WL 1572002, at *15 (D. Minn. Mar. 14, 2003). In deciding whether to decertify the class, the court does not consider the merits of plaintiffs' claims, but simply makes a factual determination as to whether the plaintiffs are similarly situated. *Cruz v. Lawson Software, Inc.*, 764 F.Supp.2d 1050, 1057 (D. Minn. 2011) (citing *Carlson v. C.H. Robinson Worldwide, Inc.,* Civ. Nos. 02-3780 (JNE/JJG), 02-4261 (JNE/JJG), 2006 WL 2830015, at *3 (D. Minn. Sept. 26, 2006) (citations omitted)); *Nerland v. Caribou Coffee Co., Inc.*, 564 F.Supp.2d 1010, 1019 (D. Minn. 2007). If the Court finds the plaintiffs are not similarly situated, the class is decertified and the opt-in plaintiffs are dismissed without prejudice. *Nerland*, 564 F.Supp.2d at 1017-1018. The named plaintiffs may then proceed to trial on their individual claims. *Id*. at 1018.

## 2. **The "Similarly Situated" Analysis.**

In order to determine whether plaintiffs are similarly situated, courts look at several factors, such as:

> (1) the extent and consequence of disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant which appear to be individual to each plaintiff; and, (3) fairness and procedural considerations.

*Burch v. Qwest Commc'n Intern., Inc.*, 677 F.Supp.2d 1101, 1114 (D. Minn. 2009)(citing *Carlson*, 2006 WL 2830015, at *3).

Courts also consider whether plaintiffs can demonstrate that the defendant had a common policy or plan in violation of FLSA that negatively impacted the original and opt-in plaintiffs. *Burch*, 677 F.Supp.2d at 1114 (citing *Carlson*, 2006 WL 2830015, at *3); *see also Saleen v. Waste Mgt., Inc.*, 649 F.Supp.2d 937, 940 (D. Minn. 2009) (plaintiffs must show they are victims of common unlawful pay policy). Ultimately, Plaintiffs have the burden to show they are similarly situated. *Burch*, 677 F.Supp.2d at 1114.

## B. **PLAINTIFFS ARE TOO DIFFERENT FOR A COLLECTIVE ACTION TO BE MANAGEABLE.**

Plaintiffs are too different to be a manageable class. They come from different locations with different supervisors and worked in different positions with different pay structures and bonus incentives. Even if they shared an employment setting, there are too many defenses available to Naturescape which are unique to various plaintiffs. This makes the class too difficult to manage. Further, it would be a great burden on

Naturescape and this Court should the class proceed with the various positions from various states with a huge range of overtime hours at stake.   Accordingly, as detailed further, decertification is proper.

### 1.  <u>Disparate Factual and Employment Settings of Individual Plaintiffs</u>.

The first "similarly situated" factor looks at the factual and employment settings of the plaintiffs.   *Smith*, 404 F.Supp.2d at 1150; *Burch*, 677 F.Supp.2d at 1114.   It is the Plaintiffs' burden to demonstrate that despite differences (such as working in different groups, reporting to different supervisors, length of time on the job and amount of work), a collective action is justified.   *Keef v. M.A. Mortenson Co.*, No. 07-CV-3915 (JMR/FLN), 2009 WL 465030 (D. Minn. Feb. 24, 2009); *Nerland*, 564 F.Supp.2d at 1018.

It is not enough that Plaintiffs share a common employer and pay scheme, the "court must also look to specific factual similarities or <u>differences</u> and manageability concerns."   *Ray v. Motel 6 Operating, Ltd., P'ship, Ltd.*, 1996 WL 938231, *4 (citing *Ulvin v. Northwestern Nat. Life Ins. Co.*, 141 F.R.D. 130, 131 (D. Minn. 1991) (emphasis added)).   When the members of the putative class come from different geographic locations with different supervisors, salaries and employment status, the individuals are too dissimilar for a collective action to be manageable and decertification is appropriate. *Ray,* 1996 WL 938231 at *4 (citing *Lusardi v. Xerox Corp.*, 122 F.R.D. 463, 466 (D. N.J. 1988)).   A lack of commonality in damages weighs towards decertification.  *Ray,* 1996 WL 938231, at * 9.

### a.   Branch Managers And Lawn Specialists Perform Different Duties.

The similarities among the plaintiffs must extend beyond job duties and pay provisions.  *Burch,* 677 F.Supp.2d 1114 (citing *Anderson v. Cagle's, Inc.*, 488 F.3d 945, 953 (11th Cir. 2007) (citation omitted)).  For example, in *Bouaphakeo v. Tyson Foods, Inc.*, the court held that where the plaintiffs were employed at the same facility, but were spread across different departments and had their own specific job duties and supervisors, they were not similarly situated for purposes of a collective action.  564 F.Supp.2d 870, 900 (N.D. Iowa 2008).

The position of branch manager is not similar to that of a lawn specialist.  Branch managers have very distinct duties from lawn specialists.  Branch managers have the ability to hire, fire and discipline employees.  Branch managers train new employees (including lawn specialists), explain the pay policies and bonus structure, and answer questions regarding the same.  Unlike lawn specialists, branch managers have an office, and are responsible for the operation of the entire branch, which may have up to 25 employees.

Branch Managers assign routes to the lawn specialists and make sure the customers are being properly serviced in that branch area.  They conduct performance reviews and audits of the lawn specialists, maintain the equipment and oversee sales efforts.  Their supervisor, the regional manager, may visit the branch as little as once per month or even less.  Branch managers, unlike the vast majority of lawn specialists, will perform tree and shrub services, which is very limited but requires a more specialized

skill.  Branch managers do not perform lawn applications anywhere near the extent of a lawn specialist.  In fact, this work is so minimal, that, unlike lawn specialists, they are not eligible for bonuses based on lawn application production.

On the other hand, lawn specialists have no management duties whatsoever.  They cannot hire, fire, or discipline others and have no management responsibilities.  Lawn specialists report to the branch manager.  Lawn specialists are responsible for performing lawn applications on an average of 150 lawns per week during the season, while branch managers may perform a handful.

### b.  Plaintiffs Worked At Several Different Branch Offices.

Another factor is the plaintiffs' work locations relative to each other.  *See West v. Border Foods, Inc.*, No. 05-2525 (DWF/RLE), 2006 WL 1892527, at *7–8 (D. Minn. July 10, 2006); *Ray* at *4, 1996 WL 938231; *Ulvin* 141 F.R.D. at 131.  In *West*, the court denied conditional certification where the plaintiff and five opt-ins (Pizza Hut shift managers) worked at seven different locations.  2006 WL 1892527, at *1.  Similarly, the *Ray* court denied conditional certification where the plaintiffs (hotel assistant managers) worked at thirty-nine different properties in twenty different states.  *Ray*, 1996 WL 938231 at *4.

In *Ulvin*, plaintiffs were denied class certification as the proposed class members were similar to those in *Lusardi v. Xerox Corp*, 122 F.R.D. 463 (D.N.J. 1988), as they varied as to "age, year of termination, type of termination, division in the company which they worked, offices in the company in which they worked, employment status,

supervisors and salaries.". *Ulvin*, 141 F.R.D. at 130.   The *Lusardi* court also looked to

these dissimilarities when it decertified the class:

> The members of the proposed class come from different departments,
> groups, organizations, suborganizations, units and local offices within the
> Xerox organization.   The opt-in plaintiffs performed different jobs at
> different geographic locations and were subject to different job actions
> concerning reductions in work force which occurred at various times so as a
> result of various decisions by different supervisors made on a decentralized
> employee-by-employee basis [and therefore] [t]his case should not continue
> in a class status.

*Id*. at 130 (citing *Lusardi*, 122 F.R.D. at 465).   The *Lusardi* Court looked at a sample

group of 64 of the 1300 opt-in plaintiffs; of the sample 64 individuals, they were

employed by 17 different Xerox groups in 34 cities in 16 different states.   *Lusardi*, 122

F.R.D. at 465.   Further, 7 of the 64 were employed by a suborganization which was

scattered across 6 different geographic locations with 5 different supervisors.   *Id*.

Naturescape is also very spread out.   Naturescape has approximately 100 lawn

specialists working at its 24 branches located in six different states.   There are eight

branches in Wisconsin, eight branches in Illinois, three branches in Indiana, two branches

in Minnesota, two branches in Iowa and one branch in Kentucky.   Each branch has one

branch manager who reports to one of three regional managers.   While they all follow the

Naturescape Employee Handbook, the branch managers implement the policies on a

decentralized level.

Naturescape's twenty-four branches differ as to branch manger, working season

(Southern branches will have longer seasons), number of employees, types of employees

(some branches do landscaping and lawn mowing, others do not), duties of the branch managers and lawn specialists, amount of overtime worked, bonuses received.

While the largest branch, Muskego, has approximately 10-15 lawn specialists, the average branch has four to five.  The regional managers report to the Vice President, located in Muskego, WI.  The fact that Plaintiffs are so spread out make for <u>individualized</u>, not collective claims.

### c.  The Work Locations Are Not Similar.

In addition to the many different branch locations, the branches are operated differently.  This is another difference that weighs heavily towards decertification.  *See West*, 2006 WL 1892527, at *9 (different managers used different means to determine the plaintiff's overtime).  The work performed by branch managers depends on how large the branch is -- the larger the branch, the less hands-on work.  New locations, on the other hand, will have more hands-on branch managers (who, like opt-in plaintiff, Scott Oman, will actually set up the branch, order furniture, work with the utility companies to set up service, etc.) until the sales volume increases and more lawn specialists can be hired to perform those duties.  If a branch manager has excessive turnover, there may be more hands-on work that they need to perform until they hire more lawn specialists.

Further, branches located in the South will have more working hours and a longer season than branches in Minnesota or Wisconsin.  These employees will have less "Winter Pay", but more actual hours worked.  Further, larger branches have mowers, service coordinators, and tree and shrub specialists, while others do not.

**d.  There Is A Lack of Commonality For Damages.**

Plaintiffs have a lack of commonality for alleged damages on several bases.  First, the amount of overtime hours varies greatly among the Plaintiffs, weighing towards decertification.  *Ray,* 1996 WL 938231, at * 4 (denying certification where the amount of overtime worked varied between the Plaintiffs); *West*, 2006 WL 1892527 at *9 (denying certification where overtime hours of the Plaintiffs varied between two and twelve hours weekly).

The variation of overtime hours worked by Plaintiffs is between 700 hours and 0.25 hours, with the median of the average opt-in at 114 hours.  This is not a case where employees were all required to work through a 30 minute lunch without getting paid for it.  Plaintiffs were able to set their own schedule and work as much or little overtime as desired, and thus, their alleged overtime hours vary by seven hundred percent.  Further, the damages between Soderberg, a branch manager with 650 overtime hours and a higher salary and bonus structure, will be substantially different from a lawn specialist such as Brett Bilzing Ernst who worked 0.25 overtime hours and never received a bonus.

Additionally, as set forth in Naturescape's Motion for Summary Judgment, Plaintiffs who cashed the check issued by Naturescape in settlement with the DOL for back wages due have been made whole, and have no damages.  In any event, there are simply too many differences in overtime hours and damages allegedly due to be able to efficiently and effectively manage this class, and decertification is proper.

## 2. __Various Individual Defenses Are Available to Naturescape For Certain Plaintiffs.__

Since collective actions subject employees to a heavy burden, the action should be decertified where there are substantial differences between the plaintiffs. *See Thompson v. Speedway SuperAmerica*, No. 08-CV-1107(PJS/RLE), 2009 WL 130069 (D. Minn. Jan. 20, 2009); *Cruz,* 764 F.Supp.2d 1061 (whether an individual is exempt from overtime is an intensely fact bound question and case specific and not proper for collective action).

Here, Naturescape has so many individual defenses that the class of 83 can be whittled down. For example, 45 Plaintiffs never received a bonus from Naturescape. Five Plaintiffs are neither branch managers nor lawn specialists. Twenty-two did not work overtime after July 15, 2009. Five did not work overtime after July 15, 2008. Eight cashed a DOL bonus check. Two are branch managers. Of the 83 Plaintiffs, if Naturescape prevails on all its individual defenses (not even including the overpayments for overtime and thus lack of damages), only 21 plaintiffs remain.[1] This represents twenty-five percent of the putative class list.

### a. Some Individuals Are Not Entitled to Overtime.

If an individual is not entitled to overtime, Naturescape may assert an affirmative defense that the person is not entitled to any overtime damages. *See Hertz v. Woodbury*

---

[1] Should this Motion be denied, as well as the Motion for Summary Judgment, Naturescape is not waiving its right to assert the various defenses it has as to each opt-in plaintiff, including, but not limited to, those set forth herein.

*County, Iowa*, 566 F.3d 775, 783 (8th Cir. 2009) (citing *Corning Glass Works v. Brennan*, 417 U.S. 188, 196–97 (1974) (the "general rule is that the application of an exemption under the Fair Labor Standards Act is a matter of affirmative defenses on which the employer has the burden of proof.")). Where an employer asserts that certain plaintiffs are exempt from overtime in an FLSA overtime case, the courts in this second stage do not determine whether in fact the individuals are exempt for decertification. Rather, the court looks at the FLSA standards to determine "whether Plaintiffs are similarly situated in relevant respects." *Smith*, 404 F.Supp.2d at 1148.

As discussed more thoroughly in Naturescape's Motion for Summary Judgment, its branch managers are exempt employees and not entitled to overtime. Thus, Naturescape will be able to assert a defense as to those specific employees (*i.e.* they are not entitled to damages in any event and should be dismissed from the case). At the decertification stage, this question is simply recognized as a possible defense since it is fact specific to the individual and the case. *Cruz*, 764 F.Supp.2d at 1061-63. In fact, the Court may ultimately determine that one branch manager is exempt and another is not. This determination is fact intensive and weighs in favor of decertification. *See, e.g., Holt v. Rite Aid Corp.*, 333 F.Supp.2d 1265, 1271 (M.D. Ala. 2010).

### b.  Some Individuals Did Not Work Overtime.

It is axiomatic to state that in order to be owed overtime, one must actually work the overtime hours. Accordingly, in FLSA overtime cases, the plaintiffs must "present evidence that they worked more than their scheduled hours without compensation." *See*

31

*Fast v. Applebee's Intern., Inc.*, 638 F.3d 872, 882 (8th Cir. 2011) (citing *Hertz v. Woodbury County, Iowa*, 566 F.3d 775, 783–84 (8th Cir. 2009)).

At the hearing for conditional certification, Plaintiffs stipulated that the collective class would be comprised only of those individuals who actually worked overtime:

> I'd like to clarify the class we seek to represent - - branch managers, lawn specialists employed by Naturescape who actually worked overtime and who were paid under this pay plan.  If there's any others, we don't seek to represent them.  So if someone worked there a week and quit, they're not in the class.  We don't want to deal with them.  It's the people who worked there and were paid pursuant to this pay plan.

(Tarara Aff. ¶ 13, Ex. L).   However, five opt-in Plaintiffs did not work overtime after July 15, 2008.  Even more (twenty-one) did not work overtime after July 15, 2009.  Thus, Naturescape will have defenses available with respect to these individuals that they are not entitled to join the litigation and not entitled to damages.

### c.  Some Individuals Were Not Paid a Bonus.

Forty-five (over fifty percent) of the 83 opt-in plaintiffs did not receive a production-based bonus.  Plaintiffs' claims rely on the receipt of a bonus to defeat the FWM.  If Plaintiff's are allowed to proceed, Naturescape has a strong defense that those forty-two opt-in plaintiffs are not similarly situated as they were not paid under the same method.  *See Bouaphakeo,* 564 F.Supp.2d at 900 (potential plaintiffs that were similarly situated, were limited to employees who were paid under the same method).

### d. Some Individuals Received Compensation for Alleged Back Wages from the DOL Settlement.

In June 2011, the DOL concluded its investigation of Naturescape's pay practices. The DOL found that certain employees who were paid production-based, non-discretionary bonuses were entitled to additional overtime as Naturescape did not include the bonuses as "wages" when determining the regular rate from which to determine the overtime rate. Unlike the State of Wisconsin, the DOL (erroneously) did not allow Naturescape credit for the hourly overtime overpayments (basing the regular rate on 40 hours versus actual hours worked).

In July 2011, Naturescape entered into a settlement with the DOL whereby it voluntarily agreed to provide backwages to certain employees who worked overtime the previous two years and who were allegedly owed more than $20. Thus, Naturescape sent a check for backwages to all the individuals identified in the DOL investigation. Some of the opt-in Plaintiffs to this litigation received a check and cashed it, and therefore already received backwages allegedly due to them under the same theory they proceed under now as an opt-in plaintiff.

Pursuant to the FLSA, individuals who accept payment as the result of a DOL settlement waive their right to sue under the FLSA:

> The Secretary is authorized to supervise the payment of the unpaid minimum wages or the unpaid overtime compensation owing to any employee or employees under section 206 or 207 of this title, and the agreement of any employee to accept such payment shall upon payment in full *constitute a wavier by such employee of any right he may have* under subsection (b) of this section to such unpaid minimum wages or unpaid

33

overtime compensation and an additional equal amount as liquidated damages.

29 U.S.C. § 216(c) (2008) (emphasis added).  *See also Blackwell v. United Drywall Supply*, 362 Fed.Appx. 56, 58 (11th Cir. 2010) (receipt of a DOL WH-58 form and cashing the check is sufficient to effect a waiver of the right to sue under the FLSA); *Morrison v. Executive Aircraft Finishing Inc.*, 434 F.Supp.2d 1314 (S.D. Fla. 2005) (although waiver is usually not an affirmative defense, a recognized exceptions is when the employee accepts full payment of unpaid wages as supervised by the DOL).

This waiver provision was added to the FLSA to incentivize employers to voluntarily accept settlements supervised by the DOL.  *See Sneed v. Sneed's Shipbuilding, Inc.*, 545 F.2d 537, 539 n.5 (5th Cir. 1977) (citing the Senate report on the 1949 amendments). Thus, Naturescape will have the defense that these individuals are not entitled to join the litigation and should be dismissed.  Similarly, the Wage & Hour Division's Field Operations Handbook explains that if an employer pays an employee wages to bring the employee's hourly salary up to minimum wage, no violation has occurred.  Dept. of Labor, Wage & Hour Division, Field Operations Handbook, §30b07(December 9, 1988), Tarara Aff. ¶ 14, Ex. M.

### e.  One Individual Never Filed An Opt-In Consent.

Under the FLSA, "a potential plaintiff's claim will be included in a collective action *only* if he expressly opts *in* to the action." *Parker v. Rowland Express, Inc.*, 492 F.Supp.2d 1159, 1163 (D. Minn. 2007) (citing 29 U.S.C § 216(b) (2008) (emphasis in

original)).  Rud did not file a Plaintiff's Consent.  Thus, Naturescape will have a defense available to him that he cannot be a member of the collective action as he has not agreed to do so.

### f.   Some Plaintiffs Are Neither Branch Managers Nor Lawn Specialists.

The Court has discretion to "clarify and narrow the proposed class . . . in order to ensure that the certified class is consistent with the purposes and requirements of the FLSA." *Burch*, 677 F.Supp.2d at 1122–1123.  Consequently, once the class has been defined, a plaintiff or opt-in who does not meet the criterion of the class should not be allowed to opt-in to the class.  The scope of the class set forth in the stipulated-to Judicial Notice is limited to branch managers and lawn specialists.  [Doc No. 32].

However, some of the opt-ins are neither, and thus, not eligible to join in the collective action.  Further, it has become apparent that individuals who were not titled a lawn specialist (but, for example, a mower), are opting-in to the litigation.  These individuals are apparently going to attempt to argue they either "really" were a lawn specialist or performed the same duties, and thus, eligible to join the class.  Accordingly, Naturescape will have multiple affirmative defenses which respect to those individuals, (*e.g.,* that they are in fact not lawn specialists, that they did not perform lawn specialist duties, and/or that they are not eligible for the class as classified by Naturescape), which favor of decertification.

### g.  The Creditability of Some Individuals' Claims Is Disputable.

Some of the plaintiffs worked an excessive amount of overtime hours in comparison to their counterparts.  For example, between July 15, 2008 and August 2011, opt-in lawn specialists Jose Felix and Matt Redig, purportedly worked over 730 hours and 580 hours, respectively.  The majority of the opt-in plaintiffs worked around 114 hours or less.  As such, Felix and Redig's claims for overtime are suspect (combined with the fact they were each disciplined multiple times for not meeting production goals) and Naturescape will assert the affirmative defense that they are estopped from joining the class.

Although estoppel is generally not a defense to a FLSA claim, there is a narrow exception where an employee affirmatively misleads an employer.  *Robertson v. LTS Management Services, LLC*, 642 F.Supp.2d 922, 933 (W.D. M.O. 2008) citing *Wlodynski v. Ryland Homes of Flordia Realty Corp.*, No. 8:08-CV-00361-JDW-MAP, 2008 WL 2783148 at, *3 (M.D. Fla. July 17, 2008) (quoting *McGlothan v. Walmart Stores, Inc.*, No. 66:06-CV-ORL-28JGG, 2006 WL 1679592 (M.D. Fla. June 14, 2006) ("estoppel provides an available affirmative defense when the employee affirmatively misleads the employer regarding the number of hours worked and the employer has no knowledge of the employee's actual hours.")).  While Naturescape paid them for the time based on their self-reported timesheets, Naturescape is entitled to make the defense that not all the alleged overtime hours were actual hours worked, and may call witnesses to testify as to the same.

36

### h. Many Individuals' Recovery Rests On A Finding of A Willful Violation.

An FLSA violation is subject to a two year statute of limitations.  29 U.S.C. § 255 (2011).  This limitation "may be extended to three years if the employer's violation is willful, *i.e.,* the employer either knew or showed reckless disregard for the matter of whether the conduct was prohibited by statute."  *Smith,* 404 F.Supp.2d at 1141 (citing *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988)).  Some of the plaintiffs stopped working for Naturescape more than two years ago.  Thus, their alleged damages rest on a finding that Naturescape's violation of the FLSA was willful.  For example, Ostlund quit on March 29, 2008.  Thus, he will not be entitled to recovery, absent a willful violation.  Naturescape would be able to assert the defense that he (and others) should be dismissed from the collective action as barred by the applicable statute of limitations.

### 3. Fairness and Procedural Considerations Support Decertification.

In order to analyze the fairness and procedural considerations related to whether individuals are "similarly situated," the Court relies upon the purpose of an action brought under 29 U.S.C. § 216(a): "'(1) reducing the burden on plaintiffs through the pooling of resources, and (2) efficiently resolving the common issues of law and fact that arise from the same illegal conduct.'"  *Cruz,* 764 F.Supp.2d at 1063 (citations omitted).  To the contrary, should this litigation proceed as a collective action, it will be inefficient,

and lengthy.  Essentially, there will be several smaller trials within the large trial because of all the individual defenses described above.

### a. Decertification Will Not Burden Plaintiffs.

Should this Court decertify the collective action, duplicative and unnecessary litigation will not burden Plaintiffs or the Court.  The Department of Labor has already determined the maximum amount that could be due to the majority of the opt-in plaintiffs pursuant to its investigation.  In fact, since the DOL inappropriately did not give Naturescape credit for overpayments made to each overtime hour (before the bonus), those who cashed the DOL check will actually come out ahead.  Further, Naturescape voluntarily paid 2008 backwages under the same method authorized by the DOL settlement.  Thus, if this case is decertified, the opt-in plaintiffs will not be harmed, even if they did not work for Naturescape after 2009.

### b. Efficient Resolution of Common Issues of Law and Fact Is Not Possible With this Collective Action.

The common issues of law are also lacking.  For example, if this case proceeds as a collective action, individual damages issues will make class management complicated. *See Cruz* 764 F.Supp.2d 1063.   For example, branch managers did not receive production bonuses.  Branch mangers received year-end bonuses along with the lawn specialists, but branch managers received a greater percentage of the year-end bonus allocated to the branch.  Further, some individuals have nominal (if any) damages, while others worked significantly more overtime.  As noted above, if individuals cashed the

DOL check, they received their alleged backwages due and are not entitled to join the class.  If individuals did not work overtime, they are not entitled to join the class.  If individuals are neither a lawn specialist nor a branch manager, they are not entitled to join the class.  Finally, if individuals did not receive a bonus, they are not entitled to join the class.

Clearly, inclusion of the opt-in plaintiffs does not reduce Plaintiff's burden or resolve common issues of fact.  Rather, it complicates the issues and will make management of the class complicated and trial lengthy.  Accordingly, decertification is proper.

Further, given the differences among the class as described above, should the case proceed as a collective action, Naturescape would not have the opportunity to effectively defend itself, which does not promote judicial economy.  Since a collective action subjects an employer to a heavy burden, courts do not certify cases where there are overwhelming differences between the plaintiffs.  This is because certifying such class would "be an exercise in gross mismanagement of judicial and litigant time and money." *See Thompson*, 2009 WL 130069, at *10 (citing *Basco v. Walmart*, No. Civ.A. 00-3184, 2004 WL 1497709 at, *8 (E.D. L.A. July 2, 2004)).  Accordingly, decertification is proper.

**C.     PLAINTIFFS WERE NOT HARMED BY A COMMON UNLAWFUL PAY POLICY.**

Plaintiffs have the burden to prove they were all harmed by the same <u>unlawful</u> companywide policy.  *Saleen*, 649 F.Supp.2d at 939–940.   Indeed, Plaintiffs allege Naturescape applied a single pay plan to all Plaintiffs which does not satisfy the requirements for using the FWM.   29 C.F.R. § 778.114 (2011).   Plaintiffs admit they were paid overtime, but claim it was not right amount because a corporate policy was applied uniformly and unlawfully.   Nevertheless, as detailed below, Naturescape's pay plan was lawful and did not harm the Plaintiffs in any way (in fact, it was more generous that what Naturescape was required to provide).

**1.   <u>Naturescape's Method of Payment Is Lawful</u>.**

As set forth in detail in its Motion for Summary Judgment, Naturescape's use of the FWM is proper and does not violate the FLSA.  In fact, the FWM is primarily utilized by seasonal employers, such as lawn care companies, "whose employees may be called to work a fluctuating number of hours each week."  *Samson v. Apollo Resources, Inc.*, 242 F.3d 629, 631 (5th Cir. 2001); *see also Lance v. The Scotts Co.*, No. 04 5270, 2005 WL 1785315 (N.D. Ill. July 21, 2005); *Haynes v. Tru-Green Corp.*, 507 N.E.2d 945 (Ill. App. Ct. 1987).   In fact, the DOL has specifically approved the FMW for employers with employees' who work irregular hours (and notes the FWM helps employers it these situations lawfully avoid making weekly computations). See Dept. of Labor, Wage &

Hour Division, Field Operations Handbook, §30b04b (March 24, 1967), Tarara Aff. 14, Ex. N.

### 2. __Naturescape Does Not Pay All Plaintiffs By A Common Pay Policy__.

Naturescape admits that from 2008 to May 31, 2011, all branch managers and lawns specialists were paid pursuant to the "Salaried" guidelines in its Pay Schedule and thus they were paid overtime at a rate of one-half their hourly wage based on a 40 hour workweek (not actual hours worked). However, that is where the commonality ends. Similar to the plaintiffs in *Cruz*, Plaintiffs' jobs are dissimilar and the pay policy is not common to all. *Cruz,* 764 F.Supp.2d 1057.

While Naturescape pays <u>every</u> employee overtime compensation (even its Vice President), that fact is not determinative of whether the employee is legally <u>entitled</u> to overtime wages under the FLSA (and thus, can be similarly situated to others allegedly harmed by not receiving proper overtime wages). *Id.* at 1058 (defendant's classification of employees does not determine the proper classification under the FSLA, but is a defense to a claim for unpaid overtime wages). Thus, they are paid the same, but not pursuant to the same policy.

### a. __Branch Managers Are Voluntarily Paid Overtime.__

Branch managers, like the Regional Mangers and the Vice President, are all paid overtime. However, Naturescape's policy is to pay branch managers based on the FWM voluntarily, not because they believe they are legally required to do so, but based on goodwill towards their employees and appreciation of their time. On the other hand,

41

Naturescape's policy for the payment of overtime for lawn specialists is based on their being entitled to overtime.  In other words, branch managers and lawn specialists who work overtime are paid overtime following the FWM, but not based on the same policy – one is mandatory and one is voluntary – two very large and important distinctions.[2]

### b. After May 31, 2011, Lawn Specialists Are Paid as Hourly Employees.

After May 31, 2011, lawn specialists have been paid as hourly employees (as set forth on the Pay Schedule guidelines), receiving time and ½ for all overtime hours worked.  Thus, not only are branch managers paid differently, but Plaintiffs who were (or are) lawn specialists after May 31, 2011, have been paid under two separate policies.

### c. Plaintiffs Earn Bonuses Differently.

The bonuses branch managers earn are not common with the bonuses that lawn specialists earn.  For example, lawn specialists are eligible for, and commonly receive, production bonuses every six weeks.  Branch managers, on the other hand, do not perform enough lawn applications to be eligible for this production bonus.  Branch managers instead rely on the year-end bonus that is awarded to a branch when they meet certain sales goals for their branch.  Then, all employees (even the administrative assistant) at the branch share the bonus.  However, the branch manager receives a higher percentage than lawn specialists at their branch for the year-end bonus.

---

[2] For efficiency's sake, Naturescape has detailed its argument with respect to the exempt status of branch managers in its Memorandum of Law in Support of Motion for Summary Judgment, and incorporates the same herein by reference.

### 3.  **Plaintiffs Have Not Been Harmed.**

Pursuant to *Saleen* and *Burch*, in order to prevail as a collective action, the plaintiffs must prove they were <u>harmed</u> by an unlawful company-wide policy.  *Saleen*, 649 F.Supp.2d at 939–940; *Burch*, 500 F.Supp.2d at 1186. Consistent with 29 C.F.R. § 778.114(a), Naturescape's pay policy provides that salaried employees <u>are paid</u> their salary whether they work few hours or many, and all overtime hours <u>are paid</u> at a rate of half their computed hourly wage for each overtime hour.

Naturescape's pay policy is not harming any Plaintiff, rather, it is <u>benefiting</u> them. In fact, by Plaintiffs' argument, it is only those who earn a bonus who are supposedly harmed by the pay policy.  This just does not make sense, and is not consistent with the purpose of the FLSA.  The FSLA was enacted to ensure employees received fair wages for a fair days' work, and to encourage employers to hire more workers and work them all less by forcing higher overtime wages.  *See Overnight Motor Transp. Co. v. Missel*, 316 U.S. 572, 578 (1942).   The fact that Naturescape is so generous with its employees' pay has not harmed them – and not surprisingly, no Plaintiff testified that they quit Naturescape because they felt they were improperly or underpaid.

Alternatively, a branch manager cannot be harmed, even if Naturescape's pay policy is held unlawful under the FLSA, as an exempt employee not legally required to be paid overtime.  *See* 29 U.S.C. § 207(a) (2010).  Branch managers cannot be harmed by not receiving something they are not legally due.

Further, as noted above, those employees who cashed their check for backwages related to the DOL investigation have not been harmed as they have been made more than whole though the efforts of the DOL.  Those who have not yet done so still may do so.  If an opt-in did not receive a check, the DOL did not believe they were owed any monies and certainly would not be harmed.  In any event, decertification is proper as, pursuant to the FSLA, as Plaintiffs can not meet their burden to prove they are similarly situated.

## IV.    CONCLUSION.

Based upon the foregoing, the Court should grant the Motion in its entirety.


Date: August 18, 2011                          By  s/ Corie J. Tarara
                                               Gregory L. Peters (0289401)
                                               Corie J. Tarara (0349197)
                                               Emily L. Ruhsam (0388890)
                                               SEATON, PETERS & REVNEW, P.A.
                                               7300 Metro Boulevard, Suite 500
                                               Minneapolis, Minnesota 55439
                                               Tel. (952) 896-1700
                                               Fax (952) 896-1704
                                               gpeters@seatonlaw.com
                                               ctarara@seatonlaw.com
                                               eruhsam@seatonlaw.com